---

NEW YORK CENT. & H. R. R. CO. v. DOMPROFF et al.

(Supreme Court, Special Term, Westchester County. April, 1909.)

1. EMINENT DOMAIN (§ 237*)—REPORT OF COMMISSIONERS—GROUNDS FOR SETTING ASIDE.

The report of commissioners in condemnation proceedings can be set aside only on the grounds that the award of damages is excessive, or that the commissioners acted on an erroneous principle.

[Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 604–613; Dec. Dig. § 237.*]

2. EMINENT DOMAIN (§ 205*)—INJURY TO PROPERTY NOT TAKEN—AMOUNT OF AWARD—EVIDENCE.

In the assessment of damages to lots by changing the course of a stream so as to close the channel on which the lots abut, evidence *held* insufficient to sustain an award of a sum equal to one-third of the value of the lots, exclusive of the buildings.

[Ed. Note.—For other cases, see Eminent Domain, Dec. Dig. § 205.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

3. EMINENT DOMAIN (§ 145*)—INJURY TO PROPERTY NOT TAKEN—ELEMENTS OF
    RECOVERY.
        Where the course of a stream will be changed as the result of con-
    demnation proceedings, the construction of a proper culvert in the new
    structure to permit water from the old channel to pass off may be con-
    sidered; it not being within the prohibition of Code Civ. Proc. § 3370,
    against making any allowance or deduction on account of any benefits
    which the owners may derive from the public use for which the property
    is to be taken.
        [Ed. Note.—For other cases, see Eminent Domain, Cent. Dig. §§ 378–
    393; Dec. Dig. § 145.*]

Condemnation proceedings by the New York Central & Hudson
River Railroad Company against George Domproff and others. Heard
on motion to set aside report of commissioners. Motion granted.

Alexander S. Lyman and George H. Walker, for plaintiff.
Albert F. Gescheidt and Jeremiah D. Toomey, for defendants.

MILLS, J. This is a proceeding taken by the above-named plain-
tiff to condemn and acquire the easements in and to the Bronx river
appurtenant to certain parcels of land abutting upon said river in the
city of Mt. Vernon, which easements are to be taken away from said
parcels by the diversion of said river therefrom. Upon trial duly had
at Special Term of this court, judgment permitting such diversion
and condemnation was given, and commissioners appointed to ascer-
tain and appraise the compensation to be made to the owners of the
several parcels for the deprivation of such easements. The commis-
sioners, after having heard the evidence submitted by the parties and
viewed the premises, have made their report making to the owner of
each parcel a substantial award. The plaintiff now moves that such
report be set aside upon the ground that the awards made are pal-
pably excessive, and that in making such awards the commissioners
acted upon an erroneous principle.

The motion was submitted upon oral argument and briefs and the
record of the proceedings had by and before the commissioners. After
carefully reading such record and considering the arguments of coun-
sel, I am convinced that the report should be set aside upon both
grounds above stated. It is well established that such a report can
be set aside only upon such grounds.

At the locality involved in this proceeding the tracks and right of
way of the Harlem Division of the plaintiff railroad company pass
through the city of Mt. Vernon in a general northerly direction from
Oak street, in said city, towards Bronxville and White Plains, beyond
to the north. Such tracks and right of way there are substantially in
the center of Railroad avenue; and the portion of said avenue lying
south of the right of way is known as South Railroad avenue, and
the portion lying north of the same as North Railroad avenue, each
being a highway. The nine parcels of land involved in this proceed-
ing lie on the west side of North Railroad avenue, beginning some 50
feet north of Oak street. Each parcel or lot fronts upon the west
side of North Railroad avenue and extends at the rear to the present
channel of the Bronx river, by a description which carries to the

center of the channel of the river. The lots vary in width along the avenue and river from 30 to 70 feet, and in depth from 63 to 100 feet, approximately. The front of the lots at the avenue line is about 25 to 30 feet higher than their rear at the easterly side of the channel of the river. Some 10 feet from the front line of the lots they descend quite sharply towards the margin of the channel. The channel itself is some 3 feet in depth and 25 feet in width. The land lying westerly of the channel for some 200 feet or 300 feet in width is low, and frequently flooded by the river in times of freshet. At approximately the northern part of these lots, taking them together, the river makes a sharp bend for some 200 feet, or thereabouts, to the east, and then follows along the rear of these lots, and then trends less sharply. back to the west.

The plaintiff, having obtained due authority from the Public Service Commission and otherwise, is engaged in the improvement of straightening its tracks through the city of Mt. Vernon, and as a part of such improvement is about to change its tracks to a line some 300 feet westerly of its present location and the locality herein involved, and as a part of such improvement, and by the requirement of such commission, it is to make a new channel for the Bronx river along a line west of the new line of its railroad, which will straighten the river by taking out the loop above mentioned, and will necessarily divert the waters of the river from the rear of these parcels. The commissioners have awarded to the owner of each parcel, as damages for such diversion, a sum amounting to $22.50 for each running foot of the width of such lot, the awards being as follows:

Parcel No. 1.................Width, 49 feet................Award, $1,102 50
Parcel No. 2.................   "    63  "  .................   "    1,417 50
Parcel No. 3.................   "    50  "  .................   "    1,125 00
Parcel No. 4.................   "    45  "  .................   "    1,012 50
Parcel No. 5.................   "    45  "  .................   "    1,012 50
Parcel No. 6.................   "    45  "  .................   "    1,012 50
Parcel No. 7.................   "    30  "  .................   "      675 00
Parcel No. 8.................   "    35  "  .................   "      787 50
Parcel No. 9.................   "    70  "  .................   "    1,575 00

Each lot is now used for residential purposes, having a dwelling house upon it. It is claimed in behalf of the defendants that, while the lots are now used for residential purposes, they are not located in a desirable residential part of the city, and that their best and real value is in their availability for use for manufacturing purposes. From their situation as detailed in the evidence, and as is well known, it would seem that this view of the matter is reasonable, except for the size of the individual lots. It must be a matter of common knowledge that each of them is too small to be available, generally speaking, for a factory site, and only two of them are held by the same owner or owners. Moreover, there is at present a substantial dwelling house upon each lot, so that it may be said that, as far as he could, the owner has fixed the character of the lot as residential. It is manifest that the houses could not advantageously be converted into separate factories, and that, therefore, they have little value for that purpose. Hence it may well be doubted whether the lots, even if naturally

available for factory sites, have any greater market value for or because of that availability than as merely residential property. Upon the former basis the value of the buildings must be substantially, or at least to a material extent, discarded, while upon the latter such value can be fully considered. The commissioners had to value the property as it then was. They could not reasonably fix the naked land value as that of factory sites, and also the value of the buildings as for residential purposes. The two bases were entirely inconsistent.

The highest value of the naked land given in the evidence—that is, by the defendants' experts—is upon the basis of $1,500 for a frontage of 25 feet along the avenue, with an average depth of 100 feet. Assuming that the commissioners viewed the property as approximately being of that average depth, they allowed as damages more than one-third of the full value of the land, aside from the buildings. There is nothing in the evidence, except the naked opinion of the experts, which indicates that the easement taken could have constituted any such proportion of the land value. The opinion of an expert in such a case is to be valued according to the reasons which he may give in support of it, when questioned upon cross-examination. Such test, applied to such witnesses, revealed nothing substantial to support their conclusions. It brought forth no evidence that the market value of such lots in such locality had ever been materially enhanced by the fact that they abutted upon the river. The proofs clearly established, and, indeed, it is a matter of common knowledge, that the waters of the Bronx river at Mt. Vernon have long since ceased to be potable, and that they are now unfit for domestic purposes. It may be true that no right has yet been secured on the part of the territory higher up the stream to so pollute such waters, and that the time may come when they will again be in a condition fit for domestic use. It therefore may be that the commissioners were warranted in considering their value for such uses.

It is manifest that for manufacturing purposes the use of those waters as appurtenant to these lots, or any of them, could never be applied to constitute a water power; e. g., by the erection of a dam and the accumulation of a head of water. The only use of the waters for manufacturing purposes suggested by the proofs, or which can be supposed, is by pumping the water into a factory and using it for the production of steam or other purposes, not directly as a means of producing power. It does not seem to me at all possible that any such use of the water could be anything like so large an element in the value of the land. The claim of the defendants' experts that the deprivation of such use could affect the value of the buildings, aside from the value of the land, is utterly unreasonable. Evidently such latter claim was not at all accepted by the commissioners, as, if it had been, their awards could not have been upon the uniform ratio of $22.50 per each foot of frontage.

It does not seem possible that the value of the use of the water, whether for domestic or manufacturing purposes, whatever its condition, as an appurtenant easement to the several lots, could vary with or be dependent solely upon the number of feet frontage of the lots

upon the river. It is plain that for manufacturing purposes each parcel, even the widest, is small; and the use of the water, namely, the capacity for drawing it from the river for such a factory, would not be at all, or certainly not entirely, dependent upon the width of the river frontage. As residential property the right to use the water for domestic purposes with the dwelling house existing upon one of the narrower parcels may be as valuable as with the dwelling house situated upon the widest parcel.

The only theory suggested by the proofs, or by my own reflections, upon which the awards could properly have been made upon the basis of a uniform allowance for each running foot of river frontage, is that the damage to the different lots from the loss of the easements is measured by the cost of filling in the rear of such lots. The record shows that before the commissioners the defendants claimed that the damage to any one of the lots as a residential lot, from taking away the easements, would be represented by the cost of building retaining walls around the rear of the lot—i. e., at the center line of the channel, the very rear of each lot—and along the sides of the lower portion of the rear, and filling up the lot inside of such walls so high that the surface water from the rear of the filled-up lot would drain easterly into the avenue. The cost of such walls and such filling in for parcel No. 1 was by such proofs shown to be the sum of $8,696.55, which was several times as much as the highest value of the land given by any witness. Such a suggestion as a measure of damages is evidently absurd, and the evidence in support of it was clearly incompetent and should not have been received. It, however, was not objected to in behalf of plaintiff.

It is to be said in support of the report of the commissioners that it awarded only about one-eighth of this preposterous sum. Under no possible view could it ever be necessary to do any such filling in, or in any way to change the natural grade of the land, which is, of course, strongly to the west or rear. The conformation of the land, as shown by the testimony and as is well known, is such that the natural drainage of these parcels of land is and must be to the west into the present river channel, or, if that be removed, to the low lands there lying. The assumption, which seems to pervade the evidence given for the defendants, that the present channel of the river, after the diversion of its waters, will not be open to the drainage of these lots as nature has intended it, appears to be absolutely unwarranted. The plans of the railroad company contemplate the proper culvert in their new structures, to permit the water which the present channel will receive to pass off, and no doubt, whether they intended making such provision or not, they will be compelled to do so.

The consideration of such feature of those plans does not fall within the prohibition contained in section 3370 of the Code of Civil Procedure against making "any allowance or deduction on account of any real or supposed benefits, which the owners may derive from the public use for which the property is to be taken or the construction of any proposed improvement connected with such public use," because the existence of such culvert is a part of the manner of diversion. If filling in

be required, it can only be at the most to maintain the grade of the land to the rear through the old channel, by filling up the portion of such channel between the present margin and the center to the grade of the rear of the lot at such margin, which portion may be left by the diversion of the waters. The evidence does not show that the expense of such filling in could amount to anything like the awards, and plainly it could not.

It is clear that the experts of the defendants based their valuations upon an entirely erroneous theory, and it seems equally clear to me that the commissioners must either have adopted an erroneous theory or else have made palpably excessive awards.

The report, therefore, must be set aside, and the matter referred back to the same commissioners for rehearing.